Present: All the Justices

BAYLINER MARINE CORPORATION

v.  Record No. 980392   OPINION BY JUSTICE BARBARA MILANO KEENAN
                                      January 8, 1999
JOHN R. CROW


              FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
                       Johnny E. Morrison, Judge


     In this appeal, the dispositive issue is whether there was

sufficient evidence to support the trial court's ruling that the

manufacturer of a sport fishing boat breached an express

warranty and implied warranties of merchantability and fitness

for a particular purpose.

     In the summer of 1989, John R. Crow was invited by John

Atherton, then a sales representative for Tidewater Yacht

Agency, Inc. (Tidewater), to ride on a new model sport fishing

boat known as a 3486 Trophy Convertible, manufactured by

Bayliner Marine Corporation (Bayliner).  At that time, Tidewater

was the exclusive authorized dealer in southeastern Virginia for

this model Bayliner boat.  During an excursion lasting about 20

minutes, Crow piloted the boat for a short period of time but

was not able to determine its speed because there was no

equipment on board for such testing.

     When Crow asked Atherton about the maximum speed of the

boat, Atherton explained that he had no personal experience with

the boat or information from other customers concerning the boat's performance. Therefore, Atherton consulted two documents described as "prop matrixes," which were included by Bayliner in its dealer's manual.

Atherton gave Crow copies of the "prop matrixes," which listed the boat models offered by Bayliner and stated the recommended propeller sizes, gear ratios, and engine sizes for each model. The "prop matrixes" also listed the maximum speed for each model. The 3486 Trophy Convertible was listed as having a maximum speed of 30 miles per hour when equipped with a size "20x20" or "2019" propeller. The boat Crow purchased did not have either size propeller but, instead, had a size "20x17" propeller.

At the bottom of one of the "prop matrixes" was the following disclaimer: "This data is intended for comparative purposes only, and is available without reference to weather conditions or other variables. All testing was done at or near sea level, with full fuel and water tanks, and approximately 600 lb. passenger and gear weight."

Atherton also showed Crow a Bayliner brochure describing the 1989 boat models, including the 3486 Trophy Convertible. The brochure included a picture of that model fully rigged for offshore fishing, accompanied by the statement that this model

2

"delivers the kind of performance you need to get to the prime offshore fishing grounds."

In August 1989, Crow entered into a written contract for the purchase of the 3486 Trophy Convertible in which he had ridden. The purchase price was $120,000, exclusive of taxes. The purchase price included various equipment to be installed by Tidewater including a generator, a cockpit cover, a "Bimini top," a winch, a spotlight, radar, a navigation system, an icemaker, fishing outriggers, an automatic pilot system, extra fuel gauges, a second radio, and air conditioning and heating units. The total weight of the added equipment was about 2,000 pounds. Crow did not test drive the boat after the additional equipment was installed or at any other time prior to taking delivery.

When Crow took delivery of the boat in September 1989, he piloted it onto the Elizabeth River. He noticed that the boat's speed measuring equipment, which was installed in accordance with the contract terms, indicated that the boat's maximum speed was 13 miles per hour. Crow immediately returned to Tidewater and reported the problem.

During the next 12 to 14 months, while Crow retained ownership and possession of the boat, Tidewater made numerous repairs and adjustments to the boat in an attempt to increase its speed capability. Despite these efforts, the boat

3

consistently achieved a maximum speed of only 17 miles per hour, except for one period following an engine modification when it temporarily reached a speed of about 24 miles per hour.  In July 1990, a representative from Bayliner wrote Crow a letter stating that the performance representations made at the time of purchase were incorrect, and that 23 to 25 miles per hour was the maximum speed the boat could achieve.

In 1992, Crow filed a motion for judgment against Tidewater, Bayliner, and Brunswick Corporation, the manufacturer of the boat's diesel engines.[1]  Crow alleged, among other things, that Bayliner breached express warranties, and implied warranties of merchantability and fitness for a particular purpose.

At a bench trial in 1994, Crow, Atherton, and Gordon W. Shelton, III, Tidewater's owner, testified that speed is a critical quality in boats used for offshore sport fishing in the Tidewater area of Virginia because of the distance between the coast and the offshore fishing grounds.  According to these witnesses, a typical offshore fishing site in that area is 90 miles from the coast.  Therefore, the speed at which the boat

---

[1]Crow nonsuited his claim against Tidewater prior to trial. The negligence claim against Brunswick was dismissed in the trial court's final judgment order.

can travel to and from fishing sites has a major impact on the amount of time left in a day for fishing.

Crow testified that because of the boat's slow speed, he could not use the boat for offshore fishing, that he had no other use for it, and that he would not have purchased the boat if he had known that its maximum speed was 23 to 25 miles per hour. Crow testified that he had not used the boat for fishing since 1991 or 1992. He admitted, however, that between September 1989, and September 1994, the boat's engines had registered about 850 hours of use. Bob Schey, Bayliner's manager of yacht testing, testified that a pleasure boat in a climate such as Virginia's typically would register 150 engine hours per year.

The trial court entered judgment in favor of Crow against Bayliner on the counts of breach of express warranty and breach of implied warranties of merchantability and fitness for a particular purpose. The court awarded Crow damages of $135,000, plus prejudgment interest from June 1993. The court explained that the $135,000 award represented the purchase price of the boat, and about $15,000 in "damages" for a portion of the expenses Crow claimed in storing, maintaining, insuring, and financing the boat.

On appeal, we review the evidence in the light most favorable to Crow, the prevailing party at trial. Tuomala v.

<u>Regent University</u>, 252 Va. 368, 375, 477 S.E.2d 501, 505 (1996); <u>W.S. Carnes, Inc. v. Chesterfield County</u>, 252 Va. 377, 385, 478 S.E.2d 295, 301 (1996).  We will uphold the trial court's judgment unless it is plainly wrong or without evidence to support it.[2]  Code § 8.01-680; <u>Horton v. Horton</u>, 254 Va. 111, 115, 487 S.E.2d 200, 203 (1997).

Crow argues that the "prop matrixes" he received created an express warranty by Bayliner that the boat he purchased was capable of a maximum speed of 30 miles per hour.  We disagree.

Code § 8.2-313 provides, in relevant part:

> Express warranties by the seller are created as follows:
> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
> (b) Any description of the goods which is made a part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

The issue whether a particular affirmation of fact made by the seller constitutes an express warranty is generally a question of fact.  See <u>id.</u>, Official Comment 3; <u>Daughtrey v. Ashe</u>, 243 Va. 73, 78, 413 S.E.2d 336, 339 (1992).  In <u>Daughtrey</u>, we examined whether a jeweler's statement on an appraisal form constituted an express warranty.  We held that the jeweler's

---

[2]Because our rulings on the warranty issues are dispositive of this appeal, we do not address Bayliner's assignments of

6

description of the particular diamonds being purchased as "v.v.s. quality" constituted an express warranty that the diamonds were, in fact, of that grade. Id. at 77, 413 S.E.2d at 338.

Unlike the representation in Daughtrey, however, the statements in the "prop matrixes" provided by Bayliner did not relate to the particular boat purchased by Crow, or to one having substantially similar characteristics. By their plain terms, the figures stated in the "prop matrixes" referred to a boat with different sized propellers that carried equipment weighing substantially less than the equipment on Crow's boat. Therefore, we conclude that the statements contained in the "prop matrixes" did not constitute an express warranty by Bayliner about the performance capabilities of the particular boat purchased by Crow.

Crow also contends that Bayliner made an express warranty regarding the boat's maximum speed in the statement in Bayliner's sales brochure that this model boat "delivers the kind of performance you need to get to the prime offshore fishing grounds." While the general rule is that a description of the goods that forms a basis of the bargain constitutes an express warranty, Code § 8.2-313(2) directs that "a statement

error concerning the damages awarded by the trial court.

purporting to be merely the seller's opinion or commendation of the goods does not create a warranty."

The statement made by Bayliner in its sales brochure is merely a commendation of the boat's performance and does not describe a specific characteristic or feature of the boat. The statement simply expressed the manufacturer's opinion concerning the quality of the boat's performance and did not create an express warranty that the boat was capable of attaining a speed of 30 miles per hour. Therefore, we conclude that the evidence does not support the trial court's finding that Bayliner breached an express warranty made to Crow.

We next consider whether the evidence supports the trial court's conclusion that Bayliner breached an implied warranty of merchantability. Crow asserts that because his boat was not capable of achieving a maximum speed of 30 miles per hour, it was not fit for its ordinary purpose as an offshore sport fishing boat. Bayliner contends in response that, although the boat did not meet the needs of this particular sport fisherman, there was no evidence from which the trial court could conclude that the boat generally was not merchantable as an offshore fishing boat. We agree with Bayliner's argument.

Code § 8.2-314 provides that, in all contracts for the sale of goods by a merchant, a warranty is implied that the goods will be merchantable. To be merchantable, the goods must be

such as would "pass without objection in the trade" and as "are fit for the ordinary purposes for which such goods are used." Code § 8.2-314(2)(a),(c).  The first phrase concerns whether a "significant segment of the buying public" would object to buying the goods, while the second phrase concerns whether the goods are "reasonably capable of performing their ordinary functions." Federal Signal Corp. v. Safety Factors, Inc., 886 P.2d 172, 180 (Wash. 1994).  In order to prove that a product is not merchantable, the complaining party must first establish the standard of merchantability in the trade.  Laird v. Scribner Coop, Inc., 466 N.W.2d 798, 804 (Neb. 1991).  Bayliner correctly notes that the record contains no evidence of the standard of merchantability in the offshore fishing boat trade.  Nor does the record contain any evidence supporting a conclusion that a significant portion of the boat-buying public would object to purchasing an offshore fishing boat with the speed capability of the 3486 Trophy Convertible.

Crow, nevertheless, relies on his own testimony that the boat's speed was inadequate for his intended use, and Atherton's opinion testimony that the boat took "a long time" to reach certain fishing grounds in the Gulf Stream off the coast of Virginia.  However, this evidence did not address the standard of merchantability in the trade or whether Crow's boat failed to meet that standard.  Thus, we hold that Crow failed to prove

that the boat would not "pass without objection in the trade" as required by Code § 8.2-314(2)(a).

We next consider whether the record supports a conclusion that Crow's boat was not fit for its ordinary purpose as an offshore sport fishing boat. Generally, the issue whether goods are fit for the ordinary purposes for which they are used is a factual question. See Federal Ins. Co. v. Village of Westmont, 649 N.E.2d 986, 990 (App. Ct. Ill. 1995); Tallmadge v. Aurora Chrysler Plymouth, Inc., 605 P.2d 1275, 1278 (Wash. Ct. App. 1979). Here, the evidence is uncontroverted that Crow used the boat for offshore fishing, at least during the first few years after purchasing it, and that the boat's engines were used for 850 hours. While Crow stated that many of those hours were incurred during various repair or modification attempts and that the boat was of little value to him, this testimony does not support a conclusion that a boat with this speed capability is generally unacceptable as an offshore fishing boat. Thus, considered in the light most favorable to Crow, the evidence fails to establish that the boat was not fit for the ordinary purpose for which it was intended.

We next address Crow's claim that Bayliner breached an implied warranty of fitness for a particular purpose. Code § 8.2-315 provides that when a seller "has reason to know any particular purpose for which the goods are required and that the

10

buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is ... an implied warranty that the goods shall be fit for such purpose." See also Medcom, Inc. v. C. Arthur Weaver Co., Inc., 232 Va. 80, 84-85, 348 S.E.2d 243, 246 (1986). This statute embodies a long-standing common law rule in Virginia. Layne-Atlantic Co. v. Koppers Co., 214 Va. 467, 471, 201 S.E.2d 609, 613 (1974). The question whether there was an implied warranty of fitness for a particular purpose in a sale of goods is ordinarily a question of fact based on the circumstances surrounding the transaction. Stones v. Sears, Roebuck & Co., 558 N.W.2d 540, 547 (Neb. 1997).

Crow contends that the "particular purpose" for which the boat was intended was use as an offshore fishing boat capable of traveling at a maximum speed of 30 miles per hour. However, to establish an implied warranty of fitness for a particular purpose, the buyer must prove as a threshold matter that he made known to the seller the particular purpose for which the goods were required. See Medcom, 232 Va. at 84, 348 S.E.2d at 246. The record before us does not support a conclusion that Crow informed Atherton of this precise requirement. Although Crow informed Atherton that he intended to use the boat for offshore fishing and discussed the boat's speed in this context, these facts did not establish that Atherton knew on the date of sale that a boat incapable of travelling at 30 miles per hour was

11

unacceptable to Crow.  Thus, we conclude that the evidence fails to support the trial court's ruling that Bayliner breached an implied warranty of fitness for a particular purpose.

For these reasons, we will reverse the trial court's judgment and enter final judgment in favor of Bayliner.

<u>Reversed and final judgment.</u>